UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas ECK and Melvin Sachs,
Defendants–Appellants.

Nos. 99–6061, 99–6156, 99–6179.

United States Court of Appeals,
Sixth Circuit.

May 29, 2001.

Before KEITH, NORRIS, and DAUGHTREY, Circuit Judges.

PER CURIAM.

In this criminal case involving a scheme to defraud persons and entities seeking business loans, we affirm the jury rendered convictions. However, in the matter

of defendant Sachs's sentence, we reverse and remand for resentencing.

## I. BACKGROUND

Defendants, Thomas Eck and Melvin Sachs, duped financially pressed entrepreneurs into paying large advance fees in exchange for worthless promises to secure business loans. The government described the scheme as follows:

First, there were the "finders", persons who located the victims or entities and persons needing business loans. Usually, these victims already had exhausted primary lending sources and were desperate and willing to take a chance. Second, there were the "brokers" or person [sic] who claimed to be able to locate a suitable lender. Third, there were the fictitious "lenders", who supposedly had committed funds to loan the client. Another group was [sic] the "underwriters", who supposedly put together and collated the loan package. They made it difficult for the client to satisfactorily put together a loan package, giving the scammers an excuse for non-performance. Finally, there were the lawyers that gave a sense of legitimacy to the scam, collected money in escrow, and handled complaints and inquiries from regulators. From time to time, the various perpetrators would alternate roles.

The scheme worked in four different phases. First, came the confidence phase where the loan brokers and finders used a myriad of ways to give credibility and legitimacy to the operation. Letterhead was concocted to create the impression that the perpetrators provided references for each other, vouching that this or that broker had successfully placed loans. They made up funding sources that sounded complicated and exotic. They used attorneys and escrow accounts for holding fees so that the client felt comfortable with handing over an advance fee.

Once the victim's confidence was established, the urgency phase began. In this phase, either the fake lender or broker expressed some urgent reason why the client needed to pay an advance fee of thousands of dollars so that the borrowing opportunity would not be lost. Usually, this involved a statement that the lender had committed or set aside a sum of money to loan the particular client, but that they could only hold it for a limited time.

Once the fee was obtained, the stalling phase began. This phase involved going through the motions of placing the loan. Legitimate lenders might be contacted with the full expectation and belief that the application would be denied. On the occasions, fake lenders were used, who actually issued worthless "loan commitments", leading clients to believe the loan was imminent. Underwriters repeatedly and constantly requested additional information from the client in order to place the loan. The clients could never satisfy the underwriters, thereby giving the perpetrators an excuse to blame the lack of funding on the borrower.

The stall would continue as long as the client allowed. Once the client realized that no money was forthcoming and began to complain loudly, the "blowout" phase began. This might involve a partial refund in some cases. More likely though, the perpetrators had a lawyer write or call the client and express dissatisfaction with the client's efforts to satisfy the underwriters, thereby causing the perpetrators to lose out on the prospect of a fee at closing. The lawyer would threaten to sue the client for malfeasance. In this way, generally, the clients were scared or coerced into drop-

ping the issue of the perpetrators' [sic] nonperformance.

Appellee's Br. at 5–7.

The scheme in this case involved an entity known as WorldVest. Mr. Sachs, who owned and operated his own loan brokering firm known as Sandberg Investments, began to refer his customers to WorldVest in 1992. Mr. Sachs was contracted to receive a "percentage of all deals" he referred to WorldVest. Generally, Mr. Sachs would negotiate an "administrative costs fee" with his client. Without his client's knowledge, he would then receive a portion of the fraudulently obtained advance fee from WorldVest. Of the approximately fifteen victims Mr. Sachs referred to WorldVest, only one received financing. In 1996, McCready Manor, a defrauded entity, sued WorldVest and numerous individuals involved with World-Vest, including Mr. Sachs. During a deposition related to this civil action, Mr. Sachs made several false statements regarding his relationship with WorldVest. These false statements later became the basis of his perjury counts in the underlying criminal matter.

Mr. Eck was an attorney and corporate officer for WorldVest. Mr. Eck regularly fielded calls from disgruntled customers and inquiring regulatory agencies. Moreover, on at least four cited occasions Mr. Eck served as a reference for WorldVest, telling potential victims that WorldVest had successfully funded his Carribean condominium project. At trial the government presented evidence demonstrating that while Mr. Eck was involved in a condominium project, WorldVest had no involvement in the project's funding. Even after learning that the principal members of WorldVest had been indicted for fraud, Mr. Eck continued to provide references for the bogus entity.

In a letter dated June 23, 1993, the principal member of the conspiracy, Anthony Conti, informed all of the various co-conspirators that WorldVest was going to "cease … operations." (J.A. at 323.) Mr. Sachs sent a similar letter, renouncing his participation in the enterprise, in September, 1993.

Messrs. Eck, Sachs and Conti were indicted by a federal grand jury on October 1, 1998. Subsequently, Conti entered a plea agreement and agreed to testify on behalf of the government. On March 24, 1999, a jury returned a verdict of guilty against Melvin Sachs and Thomas Eck for conspiring to engage in a scheme to defraud through the use of mail and interstate wire communications (Count One), in violation of 18 U.S.C. § 371, and devising a scheme to defraud through the use of interstate wire communications in furtherance of the scheme (Count Two), in violation of 18 U.S.C. § 1343. Mr. Sachs was also convicted of three counts of perjury (Counts Four, Five and Eight). Following a hearing on the defendants' respective motions for judgment of acquittal, the district court dismissed two of the perjury counts against Mr. Sachs (Counts Five and Eight), but upheld the verdict in all other respects.

Prior to sentencing, a presentence investigation report was prepared for Messrs. Eck and Sachs. Pursuant to the United States Sentencing Guidelines Manual ("guidelines"), Mr. Eck received a guideline range of imprisonment of 37 to 46 months; Mr. Sachs's guideline range of imprisonment was 27–33 months. Subsequently, at separate hearings, the defendants were both sentenced to one year and one day. Defendant Sachs's sentence was the result of his motion for downward departure based upon "proportionality" concerns.[1] Specifically, the principal member of the conspiracy, Anthony Conti, had re-

---

1. Mr. Eck's sentence was also the result of a downward departure. The government, however, did not appeal Mr. Eck's sentence. To date, Mr. Eck has made restitution payments

ceived a sentence of 30 months for his role in various advance fee schemes. The district court found that the "difference between the sentence that Mr. Sachs would receive under the normal guideline calculation and the sentence of Anthony Conti and his co-defendant, Mr. Eck, make this case unusual and take it outside of the heartland." (J.A. at 1069.)

The defendants have now filed this appeal, asserting that the indictment violated the five-year statute of limitations and that the evidence was insufficient to support the verdict. Additionally, the government appeals Mr. Sachs's sentence.

## II. DISCUSSION

### A. Statute of Limitations

■ The defendants contend that the evidence adduced at trial sufficiently demonstrated that the conspiracy charges are barred by the applicable statute of limitations. In a criminal prosecution for conspiracy, the date of the last overt act in the indictment determines whether or not a prosecution has been timely commenced. See 18 U.S.C. § 3282.

Mr. Eck alleges that the overt acts listed in the indictment which provide the jurisdictional basis for this action are not attributable to him, thus, the indictment is violative of the statute of limitations. Additionally, Messrs. Eck and Sachs both

allege that they withdrew from the conspiracy during the summer or early fall months of 1993. Noting that the grand jury returned the indictment on October 1, 1998, they assert that the applicable five-year statute of limitations, see 18 U.S.C. § 3282, for conspiracy cases bars the prosecution of this action.

There are four overt acts that are within the statute of limitations. Two of these acts relate to the false testimony given by Mr. Sachs in civil depositions, conducted in 1995, regarding the McCready Manor transaction. The third act is a letter dated October 28, 1993, written by Anthony Conti and addressed to a McCready Manor representative, assuring him that the McCready Manor funds were expected in a few days. The fourth act is a phone call on or about November 3, 1993, from Anthony Conti in New York to another McCready Manor representative in Richmond, Kentucky concerning a request for a refund of McCready Manor's advance fee. With these events in mind, we now turn to their respective arguments.

### 1. Mr. Eck

■ Mr. Eck argues that he had no involvement in the McCready Manor scheme and, consequently, he cannot be held accountable for the letter and subsequent phone call.[2] Moreover, he argues

---

in excess of $250,000. Consequently, the government submits that Mr. Eck's "extraordinary" efforts towards restitution took his case outside the heartland of the sentencing guidelines. Accordingly, the government has not contested Mr. Eck's sentence.

2. We note the government's assertion that Mr. Eck has "waived" his statute of limitations argument due to his failure to raise this issue prior to trial. In response, Mr. Eck argues that a pretrial motion raising the statute of limitations issue would have been futile as the district court could not have ruled on this motion prior to the government's presentation of the evidence. We agree. With regard to

the statute of limitations, Mr. Eck contends that the government failed to demonstrate that the acts related to the McCready Manor fraud were within the scope of the conspiracy he intended to join. This argument relies, principally, upon the evidence presented at trial. In the valid indictment presented to the district court, the conspiracy was described as including acts which bring the indictment within the limitations period. Accordingly, Mr. Eck's motion to dismiss based upon the statute of limitations would have been premature if brought prior to allowing the government to prove the allegations contained in its valid indictment.

that the statements given by Mr. Sachs in the McCready Manor scheme are beyond the "scope" of the intended conspiracy and are thus not attributable to him under the holding of *United States v. Juodakis,* 834 F.2d 1099 (1st Cir.1987). Mr. Eck contends that because these acts are not attributable to him, the government has failed to demonstrate that an overt act in furtherance of the particular agreement he entered occurred within the limitations period.

In *United States v. Juodakis,* the defendant was convicted of conspiracy to manufacture methaqualone. *Id.* The indictment was returned on November 25, 1985, charging the last overt act as having been committed on July 30, 1981. Thus, there were overt acts charged in the indictment that were within the statute of limitations. However, the overt acts which provided the jurisdictional basis for the defendant's inclusion in the action were performed by his co-conspirators. At the time the acts were committed, defendant had moved from Massachusetts (the location of the methaqualone conspiracy) to California and had begun to make methaqualone for himself. In fact, defendant's participation in the conspiracy ended, in total, in June of 1980. Meanwhile, defendant's co-conspirators continued to perform acts in furtherance of the conspiracy within the limitations period. In the summer of 1981, the Federal Drug Enforcement Agency searched the premises where the methaqualone had been manufactured. After the search, the DEA padlocked the door and put seals on the door and building, indicating that a search warrant had been executed. Thereafter, one of the co-defendants was seen removing equipment from the sealed premises. The co-conspirators removed the equipment and transported it to a new location where they intended to re-establish the enterprise. The court ruled that the co-conspirators activities in moving the lab equipment could not be "part of or a logical consequence of the particular agreement defendant entered into when he threw in with [the co-defendants] in South Boston." *Id.* at 1104. Consequently, the court reversed the conviction.

Mr. Eck's reliance on *Juodakis,* however, is misplaced. First, the court in *Juodakis* gave great weight to the unforeseeability of the co-conspirator's acts. In the instant matter, even if this Court were to assume, arguendo, that Mr. Eck was unaware of the McCready Manor deal specifically, the false statements of Mr. Sachs and the contacts initiated by Conti are the foreseeable results of the conspiracy. Each of the participants were aware that there were other participants, who negotiated their own deals in furtherance of the criminal enterprise. "It is not necessary to show that a defendant knew every member of the conspiracy or the full extent of the enterprise. It is not even necessary for a coconspirator to know about the acts of another coconspirator in order to be held responsible for those acts. Such evidence can be inferred from the interdependence of the enterprise." *United States v. Carr,* 5 F.3d 986, 990 (6th Cir.1993) (citations omitted). Mr. Eck's argument that the false statements of Mr. Sachs were unforeseeable is particularly unpersuasive. This scheme was based entirely upon false statements—Mr. Eck himself was attributed with making false references to potential victims. It is disingenuous for Mr. Eck to now argue that the false statements of Mr. Sachs were unforeseeable and "beyond the scope of the conspiracy" he entered.

Second, in *Juodakis* the defendant completely withdrew from the goals and purposes of the conspiracy. 834 F.2d at 1104. In this action, Mr. Eck continued to assist and associate with the members of World-Vest within the limitations period. More-

over, there was some evidence of Mr. Eck's participation in the McCready Manor scheme. Escrow instructions were sent to McCready Manor representatives on Mr. Eck's letterhead. The government also presented testimony that Mr. Eck assured several individuals associated with McCready Manor that WorldVest was a legitimate enterprise.

Therefore, we find that the acts of Messrs. Sachs and Conti were the "logical consequences" of the overarching scheme, *Juodakis*, 834 F.2d at 1104, and, accordingly, Mr. Eck's arguments must fail.

### 2. Mr. Sachs

■ Defendant Sachs argues that a letter he sent to Anthony Conti, dated September 2, 1993, demonstrates that he withdrew from the conspiracy more than five years prior to the date the indictment in this case was filed. The district court reviewed the letter and concluded that it presented an issue for the jury's determination. Subsequently, the district court properly instructed the jury as to the requirements for finding withdrawal by any of the parties from the conspiracy.[3] Moreover, the government presented compelling evidence that Mr. Sachs continued to "acquiesce" in the actions of WorldVest long after dispatching his September 2, 1993 letter repudiating the goals of the conspiracy.[4] "[E]ven if a defendant has taken affirmative action contrary to a con-

spiracy, it is a jury question whether there was withdrawal if there is evidence that defendant acquiesced in the conspiracy after the affirmative act.... The jury ... could find [that the defendant's later acts] 'neutralize[d] ... the effect of his former declarations....'" *United States v. Lash*, 937 F.2d 1077, 1084 (6th Cir.1991) (quoting *Hyde v. United States*, 225 U.S. 347, 371, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)). Further, the false statements made by Mr. Sachs constitute two of the acts within the prescribed period of limitations. The government characterized these statements as being "in furtherance of the conspiracy"; a characterization the jury obviously accepted. Accordingly, Mr. Sachs's statute of limitations argument must fail.

### B. Sufficiency of the Evidence

■ We now turn to the task of determining whether there was sufficient evidence to sustain the defendants' respective convictions. Both Mr. Eck and Mr. Sachs argue that the government presented insufficient evidence of their participation in the fraud scheme. Mr. Sachs additionally argues that there was insufficient evidence to establish his intent to commit perjury. In a criminal matter, we review a claim for insufficiency of evidence to determine "whether, after viewing the evidence in the light most favorable to the government and drawing all inferences in the government's favor ... any rational trier of fact could have found the elements of the of-

---

**3.** The jury instruction provided, in pertinent part:

> To prove this defense Mr. Sachs must establish each and every one of the following things by a preponderance of the evidence: First, that he completely withdrew from the conspiracy. A partial or temporary withdrawal is not sufficient. Second, that he took some affirmative step to renounce or defeat the purpose of the conspiracy ... The third thing that Mr. Sachs must prove is that he withdrew before October 1, 1993.... If, however, the government

> convinces you beyond a reasonable doubt that after the withdrawal Mr. Sachs acted in a way which neutralized or negated his withdrawal, then you may find Mr. Sachs guilty.

**4.** On September 22, 1993, Mr. Sachs sent one of his victims a letter, indicating that funding was progressing. Additionally, the government demonstrated that between September 22, 1993 and February 4, 1994, Messrs. Sachs and Conti corresponded on at least seven occasions.

fense beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See also United States v. Maliszewski,* 161 F.3d 992, 1005 (6th Cir.1998).

### 1. Mr. Eck

Mr. Eck contends that the only act the jury could have construed as conspiratorial was a reference he provided to a potential victim of WorldVest after learning that Conti and another WorldVest officer had been indicted for fraud. However, the government presented substantial evidence of Mr. Eck's participation in the scheme. At trial, witnesses testified that Mr. Eck handled some of the "blowout work" with disgruntled victims.[5] It was also evidenced that Mr. Eck allowed WorldVest to use his Nevada address to avoid regulators in Arizona. Additionally, it was shown, through witness testimony and written documents, that Mr. Eck gave false references for WorldVest on at least four occasions. Finally, the government introduced evidence demonstrating that Mr. Eck helped Conti establish a new business in Florida—after the FBI's discovery of the WorldVest scheme. In this vein, Mr. Eck also helped convince Conti's probation officer that this new business was legitimate.

Accordingly, we find that there is sufficient evidence to support the conclusion that Mr. Eck knowingly participated in the scheme advanced by WorldVest and, consequently, Mr. Eck's arguments to the contrary must fail.

### 2. Mr. Sachs

With respect to the fraud counts, Mr. Sachs argues that there was insufficient proof to support a finding that he knowingly engaged in a conspiracy to commit fraud. However, as was the case with Mr. Eck, there is substantial evidence to the contrary.

Anthony Tomasi, Jr., the son of Anthony Conti and a co-conspirator, testified that everyone involved in WorldVest knew that the operation was a scheme and that Mr. Sachs received a "kickback" for the clients he provided. The government also introduced copies of cancelled checks, endorsed by Mr. Sachs, which support this testimony. In addition, Mr. Sachs sent a copy of a letter, drafted by the Brazilian government, to McCready Manor's representatives. This letter, written in Portugese, purported to confirm a "60–million dollar" loan that WorldVest had arranged for the country of Brazil. (J.A. at 452.) Ultimately, this letter was proven to be fraudulent. The government further demonstrated that despite the numerous individuals Mr. Sachs referred to WorldVest, funding was only obtained for one entity.

Mr. Sachs also renews his "withdrawal from the conspiracy argument," in his effort to demonstrate his lack of participation in the conspiracy. However, as discussed above, this argument was presented to the jury, the trial judge and this Court. We have each, in turn, found Mr. Sachs's contentions of withdrawal unpersuasive.

The evidence in this matter is manifestly sufficient to establish that Mr. Sachs was an integral participant of the conspiracy and, thus, a rational juror could conclude beyond a reasonable doubt that Mr. Sachs knowingly participated in the conspiracy to defraud. Accordingly, Mr. Sachs's arguments to the contrary must fail.

Mr. Sachs also argues that the evidence presented in support of his conviction for perjury is insufficient. Mr. Sachs was con-

---

5. As noted earlier, "blowout work" is the process whereby the participants would threaten legal action against a disgruntled client in an effort to dissuade the client from pursuing legal recourse against WorldVest.

victed of perjury based upon his testimony in a civil deposition related to the McCready Manor matter. During the civil action, Mr. Sachs testified that he was not contracted to receive a portion of the advance fee. However, during the criminal proceeding, the testimony revealed that Mr. Sachs received a percentage of all the advance fees WorldVest obtained from Mr. Sachs's referrals. Moreover, the government introduced cancelled check stubs which corroborated this testimony. Thus, when viewed in a light most favorable to the government, this evidence is sufficient to sustain the perjury conviction.

### C. Mr. Sachs's Motion for Downward Departure

Mr. Sachs motioned for a downward departure in his sentence, which the district court granted over the government's objection. The district court based its departure upon "the goal of proportionality among conspirators." (J.A. at 1070.) The trial court sentenced Mr. Sachs to 366 days of imprisonment. Mr. Sachs was also ordered to pay $293, 325 in restitution jointly with Mr. Eck. On appeal, the government challenges the district court's downward departure.

We review the district court's decision to grant a downward departure for an abuse of discretion. *See Koon v. United States,* 518 U.S. 81, 91, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Weaver,* 126 F.3d 789, 792 (6th Cir.1997). " '[A] district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court.' " *United States v. Crouse,* 145 F.3d 786, 788 (6th Cir.1998) (quoting *Koon,* 518 U.S. at 98 (1996)).

Whether a certain factor constitutes sufficient justification for a departure is a question of law, thus, if a court errs by relying on an inappropriate factor, it has necessarily abused its discretion. *See Koon,* 518 U.S. at 100.

When contemplating a departure from the guidelines, the court should consider the following factors: (1) what aspects of the case take it outside the "heartland" of cases; (2) whether the Commission has forbidden departures based upon these aspects; and (3) whether the Commission has encouraged or discouraged departures on these bases. *See Koon,* 518 U.S. at 95; *United States v. Coleman,* 188 F.3d 354, 358 (6th Cir.1999).

■ The trial court, in stating its rationale for the departure, opined that "the difference between what Mr. Sachs would receive under the normal guideline calculation and the sentence of Anthony Conti and his co-defendant, Thomas Eck, make this case unusual and take it outside the heartland. Conti was the mastermind behind WorldVest and other advanced-fee schemes.... Conti received only a 30-month sentence in 1994 in connection with the Palm Financial/Golden Sun conspiracy. I'm concerned now because Mr. Sachs is looking at 27 to 33 months, which is virtually identical to Mr. Conti's sentence." (J.A. at 1069–70.) The court then departed downward fifteen months, and sentenced Mr. Sachs to one year and one day.

In *United States v. Parker,* 912 F.2d 156, 158 (6th Cir.1990), this Court held that mere equalization of sentences is not an appropriate basis for a downward departure.[6] As noted above, the trial court must cite a *valid* reason for removing a defendant's sentence from the "heartland"

---

**6.** In a subsequent opinion, a separate panel of this Court found that "district courts ... are not precluded as a matter of law from departing from the guidelines in order to ... conform one conspirator's sentence to the sentences imposed on his co-conspirators." *United States v. Nelson,* 918 F.2d 1268, 1273 (6th Cir.1990). In *United States v. Gessa,* 971 F.2d 1257, 1267 (6th Cir.1992), an en banc

of cases. At present, the law of this Circuit prohibits equalization of sentences and, consequently, mere disparity between Mr. Sachs's sentence and the sentences of his fellow conspirators will not sustain a downward departure. As equalization was the only factor cited by the trial court to support its decision to take this case outside the heartland of the sentencing guidelines, this case must be remanded for resentencing.

### III. CONCLUSION

Therefore, the jury convictions of Mr. Thomas Eck and Mr. Melvin Sachs are affirmed. However, we REVERSE the sentenced imposed upon defendant Melvin Sachs and REMAND for resentencing consistent with this opinion.

panel of this Court recognized that district court's "may determine whether a downward departure to equalize sentences is permissible in light of this court's prior statements in *United States v. Nelson,* 918 F.2d 1268 (6th Cir.1990) and *United States v. Parker,* 912 F.2d 156 (6th Cir.1990)." While the en banc court recognized the need to harmonize these divergent holdings, we found that the "issue [wa]s not yet ripe for review" and reserved consideration of the matter. *Id.* at 1267 n. 9. In cases subsequent to *Gessa,* panels of this court have followed the holding of *Parker.* *See, e.g., United States v. Epley,* 52 F.3d 571, 574 (6th Cir.1995).