**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

---

No. 01-2439

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT CAREY, A/K/A "POPS,"

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, United States District Judge]

---

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Bownes, Senior Circuit Judge.

---

Thea A. Stewart for appellant.
John A. Wortmann, Jr., Assistant United States Attorney, with whom Michael Sullivan, United States Attorney, was on brief for appellee.

---

February 14, 2003

---

**BOWNES, <u>Senior Circuit Judge</u>**.  Defendant-Appellant Robert Carey ("Carey") appeals from his conviction and subsequent sentencing in the United States District Court for the District of Massachusetts.  Count One charged Carey along with Chamond Henderson ("Henderson") and Kimberly Powers ("Powers") with conspiring to possess with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 846.[1]  Carey, Henderson, and Powers were also charged in Count Five with possessing crack cocaine with intent to distribute it and with distribution in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Carey and Henderson were tried jointly.  Both were convicted and appealed separately.  Henderson's appeal is also before us, and is the subject of a separate opinion.  <u>See</u> <u>United States</u> v. <u>Henderson</u>, No. 01-2392.  Powers entered into a plea bargain with the government and testified at the trial.

## I.  THE EVIDENCE

In October 1998, the Drug Enforcement Administration ("DEA") began an investigation into crack cocaine trafficking in Worcester, Massachusetts.  Special Agents Timothy Anderson and Robert Guerard of the DEA used Joseph Mozynski ("Mozynski"), a

---

[1] Grams and ounces are used interchangeably throughout this opinion.  It should be noted that one ounce equals 28.35 grams. <u>See</u> United States Sentencing Commission, <u>Guidelines Manual</u>, § 2D1.1, comments.  (n.11) (Nov. 2002).

known crack cocaine user, to serve as a cooperating witness. Mozynski made four purchases of significant quantities of crack cocaine during the investigation. The DEA wired Mozynski with a concealed monitoring device that enabled agents to tape record the drug transactions. The first of these drug transactions occurred at Carey's house on 6 Denny Street. The subsequent transactions originated at Carey's house but were completed at various locations within a two-block radius.

During the first transaction, on October 19, 1998, Mozynski purchased 23.7 grams of crack cocaine from co-defendant Henderson at Carey's house. Prior to October 19, Carey told Mozynski that all he needed was "24 hours notice to get the deal done." Mozynski and Carey agreed that Mozynski would pay $1,200 for 25 grams of crack cocaine, with Carey getting $200 for facilitating the deal, and that Mozynski would pick up the crack cocaine at Carey's residence. On October 19, Mozynski entered Carey's house and met with Carey, co-defendant Powers, and a woman named Lynn Cappulett. Carey paged Henderson after Mozynski showed Powers the $1,200. When Henderson called, Carey answered and handed the phone to Powers. Powers told Henderson that Mozynski was there with the money, and then informed Mozynski that Henderson would arrive within five minutes. Henderson called one minute later, and Carey again answered the phone and gave it to Powers. Carey also told Mozynski that he wanted his $200 for setting up the

-3-

deal. Shortly thereafter, Henderson arrived at Carey's residence. Henderson, Mozynski, and Powers went into a bedroom where Henderson gave Mozynski 23.7 grams of crack cocaine in exchange for $1,200. Henderson and Mozynski discussed doing larger deals in the future, and Henderson told Mozynski to contact him through Powers. Carey later became angry because he did not get the $200 he expected to receive from the drug deal. Carey told Powers that he was upset because he had been cut out of the deal and lost money as a result.

On October 27, 1998, Mozynski met Powers at Carey's residence. Carey told Powers "I don't want nobody around here," and "[i]ts got nothing to do with me and you know it." Mozysnki and Powers left Carey's house and successfully conducted a drug transaction with Henderson in the basement of Henderson's apartment building. On November 3, 1998, Mozysnki again met Powers at Carey's house, but left to conclude a drug transaction with Henderson in the basement of his apartment.[2]

On November 16, 1988, Mozynski met with Carey and Powers at Carey's house. Thereafter, Powers and Mozynski left the house and conducted another drug transaction with Henderson at a different location, except this time Henderson sold them wax. Once the agents realized that Henderson had sold wax rather than crack cocaine, they directed Mozynski to contact Henderson. Mozynski

_____

[2] For a more detailed account of the October 27, and November 3, 1998, transactions, see Henderson, No. 01-2392.

-4-

unsuccessfully attempted to contact Henderson and Powers, and then called Carey. Carey agreed to call Henderson to "find out what happened." After waiting to get a response by phone, the agents instructed Mozynski to go to Carey's residence in order to talk to Carey directly.

Mozynski went to Carey's residence three separate times to speak with Carey. Thereafter, Carey tried to arrange the delivery of crack cocaine from Henderson. Carey called Henderson on the phone so that Mozynski and Henderson could further discuss Henderson's delivery of the crack cocaine to Agent Guerard. Carey even provided Mozynski with Henderson's pager number, which Mozynski subsequently gave to Agent Guerard. Agent Guerard paged Henderson, who returned the page and promised to deliver one ounce of crack cocaine on the following day, and two-and-one-half ounces on the day after that. On November 17, 1998, Mozynski arranged with Henderson, through Powers, to receive the one ounce of crack cocaine promised by Henderson to Agent Guerard. Mozynski met Powers on Goulding Street in Worcester, two blocks away from Henderson's apartment building. Henderson gave a package containing 19.68 grams of crack cocaine to Powers and Powers then gave the crack cocaine to Mozynski.

Additional evidence relevant to Carey included testimony at trial by Powers that she saw Carey sell crack cocaine "hundreds of times" and that his supplier was Henderson. Powers said that

-5-

she saw Carey purchase crack cocaine from Henderson at least one hundred times, and that Carey either used the crack cocaine himself or resold it to his own customers. Powers further testified that both she and Carey sold crack cocaine out of Carey's residence.

There was other evidence of Carey's drug sales. Mozynski testified that he purchased crack cocaine from Carey on a separate occasion in early October 1998. A recorded conversation between Carey and Mozynski at Carey's house included a statement by a third person asking Carey for $20 worth of crack cocaine. At the time of Carey's arrest, agents seized quantities of crack cocaine and more than $1,000 cash from Carey's house.

## II. __THE ISSUES__

A. Sufficiency of the Evidence

1. Testimony of Powers and Mozynski

Carey argues that the government's evidence was insufficient to support the jury verdict against him for conspiracy to distribute crack cocaine and for aiding and abetting the distribution of crack cocaine. In considering Carey's sufficiency claims, we must "view the evidence, together with all reasonable inferences that may be drawn therefrom, in the light most favorable to the government" and consider whether a rational fact finder could have found guilt beyond a reasonable doubt. United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994) (internal quotations

omitted).  We review "the totality of the evidence, both direct and circumstantial."  United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997).  All issues of credibility must be resolved in favor of the verdict.  United States v. Nueva, 979 F.2d. 880, 883 (1st Cir. 1992).

To prove conspiracy in a criminal case, the government must demonstrate beyond a reasonable doubt that an agreement existed to commit the underlying substantive offense, that the defendant knew of the agreement, and that he opted to join the conspiracy with the intention that the substantive offense be committed.  See United States v. Barnes, 244 F.3d 172, 175 (1st Cir. 2001).  To convict Carey of the conspiracy charge, the government had to prove beyond a reasonable doubt that Carey intended to agree and intended that crack cocaine be possessed and distributed.  See United States v. Cruz, 981 F.2d 613, 616 (1st Cir. 1992).  "The agreement may be express or tacit and may be proved by direct or circumstantial evidence."  United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993).

Carey argues that there was no reliable evidence showing any agreement on his part to enter into a conspiracy to distribute crack cocaine.  Specifically, he contends that the testimony of Powers and Mozynski was "inherently unreliable," and failed to establish his participation in the conspiracy.  We disagree.

-7-

This circuit has held that "[u]ncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible." United States v. Torres-Galindo, 206 F.3d 136, 139-40 (1st Cir. 2000). The testimony of Powers and Mozynski was not only corroborated and credible, but also established Carey's participation in the conspiracy. Each witness' testimony about Carey's involvement in the drug deals was corroborated by the fact that the first deal took place at Carey's house; the fact that crack cocaine and cash were found in Carey's home at the time of his arrest; and the fact that Carey made incriminating statements which were recorded throughout the investigation. In addition, while Powers and Mozynski had questionable backgrounds that called their credibility into question, those issues were aired before the jury throughout the trial. The jury also was instructed that it was to assess the credibility of the witnesses in reaching a verdict of guilt beyond a reasonable doubt.

Powers' and Mozynski's testimony further demonstrated Carey's participation in the conspiracy. Their testimony showed that Carey initiated the drug relationship between Mozynski and the other members of the conspiracy. Carey agreed to sell Mozynski crack cocaine that he would be getting from Henderson prior to being cut out of the deal. Powers' testimony further demonstrated that Carey distributed crack cocaine from his house throughout the

period of the conspiracy, and that he made more than one hundred crack cocaine purchases from Henderson. Mozynski additionally testified that he had purchased crack cocaine from Carey the week before the first charged sale. Given the sufficiency of Powers' and Mozynski's testimony, a rational trier of fact could find guilt beyond a reasonable doubt.

Finally, Carey asserts that Powers' and Mozynski's testimony did not support a conviction for aiding and abetting in the distribution of crack cocaine. See 21 U.S.C. § 841(a); 18 U.S.C. § 2. We observe, however, that the identical circumstantial and credibility assessments which permitted the jury to determine that Carey conspired with Henderson to possess crack cocaine for distribution suffice as well to establish, beyond a reasonable doubt, that Carey consciously sought to distribute the crack cocaine. See United States v. Arias, 238 F.3d 1, 5 (1st Cir. 2001).

2. Tape Recordings

We also disagree with Carey's claim that the tape recordings did not provide additional evidence in support of his conviction. Although it is not clear from his brief, the gist of Carey's argument appears to be that the tape recordings did not constitute evidence against him because they were either inaudible, or, in the alternative, actually exculpatory. Carey contends that the tape recordings were "all somewhat inaudible" and "difficult to

-9-

hear," yet in the same breath argues that they somehow show that "the defendant did not want any part of the transactions."

In any event, we do not find the statements he allegedly made on the recordings exculpatory. Carey believes those comments -- "I don't want nobody around here" and "It's got nothing to do with me and you know it" -- indicate that he had no desire to participate in the conspiracy. Be that as it may, his reliance on these remarks is misplaced because they do not constitute a legally sufficient withdrawal from the conspiracy. Cf. United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) ("[T]o withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy"); United States v. Dunn, 758 F.2d 30, 37-38 (1st Cir. 1985) (mere disagreement with co-conspirators is insufficient to constitute withdrawal from conspiracy). At best, Carey's statements constituted some evidence from which the jury could have found that he never joined the conspiracy in the first instance. Carey argued as much to the jurors, and they ultimately rejected this argument.

Carey also attacks the transcripts of the tape recordings the government provided the jury at the trial. As he would have it, the transcripts should have not been considered as evidence to support a conviction because they were the government's "interpretation" of the tapes. Carey overlooks the fact that even if it mattered who "interpreted" the recordings, the transcripts

-10-

are not evidence.  See United States v. Richman, 600 F.2d 286, 295 (1st Cir. 1979).  The district court, sensitive to this issue, gave a cautionary instruction to the jury explaining that "if what you hear on the tape itself is different from what shows up on the transcript, it's the tape that's the evidence, not the transcripts."  Thus, we are satisfied that the transcripts were properly utilized by the court.

### 3.  Carey's Absence

Carey further argues that his absence during the drug deals indicated that he did not participate in the conspiracy.  The record, however, supports a finding of the opposite.  We have said that "proof of direct participation in the sale of drugs is not required to convict in a drug conspiracy case."  United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998).  Here, there was sufficient evidence from which a rational juror could find that Carey conspired with Henderson and Powers to distribute crack cocaine: Carey had initially set up the October 19, 1998 deal and had repeatedly demanded that he be paid for doing so; he first contacted Henderson about the possibility of selling ounce quantities of crack cocaine to Mozynski; he told Mozynski that "all he needed was 24 hours notice to get the deal done"; he allowed his house to be used for the October 19, 1998 deal; and he facilitated the delivery of the crack cocaine on November 17 in order to avoid

a dispute between Henderson and Mozynski over the fraudulent sale of wax.

Carey's involvement in the distribution of crack cocaine was also corroborated by the following evidence: the November 16, 1998, tape recording where a third party was heard asking Carey for crack cocaine; the crack cocaine and cash found in his house at the time of his arrest; the intimate knowledge he displayed of Henderson's trafficking activities during his taped conversation with Mozynski on November 16; the awareness he displayed of other drug transactions throughout the investigation; and Powers' testimony that she saw Carey buy crack cocaine from Henderson hundreds of times and that Carey resold it to his own customers.

In sum, based on the record, we conclude that there was sufficient evidence for a jury to find Carey guilty beyond a reasonable doubt.

B.  Co-Conspirators' Hearsay Declarations

Carey argues that the trial court erred by improperly admitting co-conspirator statements into evidence because there was no evidence of a conspiracy.  The court reviews a trial court's determination that statements were co-conspirator statements admissible pursuant to Fed. R. Evid. 801(d)(2)(E) under the clear error standard.  See United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002).  A statement offered against a party is not hearsay if it is "a statement by a co-conspirator of a party during the course

and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements of co-conspirators are admissible under Rule 801(d)(2)(E) only if the trial court finds it "more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in furtherance of the conspiracy." United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). District courts frequently allow co-conspirator statements to be admitted provisionally, subject to the trial court's final Petrozziello determination, which should be made "at the close of all the evidence" and "out of the hearing of the jury." United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980).

At the close of evidence during the trial, Carey argued for the exclusion of the co-conspirators' hearsay statements, reiterating his claim that the testimony of Mozynski and Powers was inherently unreliable, and therefore should be excluded. As we have already discussed, each witness testified that Carey was involved in the distribution of crack cocaine and assisted in setting up the first sale on October 19. This testimony was corroborated by other evidence. In light of this evidence, the district court properly admitted the co-conspirator statements.

C. The Prosecutor's Closing Argument

Carey relies exclusively on the identical, and ultimately unavailing, claims raised by co-defendant Henderson alleging that the government's closing argument improperly persuaded the jury to

-13-

convict.  We need not address these arguments here because we have considered, and rejected, them in his co-defendant's companion case.  See Henderson, No. 01-2392.

D.  The Amount of Crack Cocaine

We review factual findings by the sentencing court as to drug quantity only for clear error.  See Sepulveda, 15 F.3d at 1196.  The sentencing court has broad discretion to determine what information is "sufficiently dependable to be used in imposing sentence."  United States v. Tardiff, 969 F.2d 1283, 1287 (1st Cir. 1992).  Because of the impact of quantity on the length of sentence, the sentencing court must "err on the side of caution."  United States v. Sklar, 920 F.2d 107, 113 (1st Cir. 1990).  But if the record permits more than one plausible alternative, the district court's choice between them cannot be deemed "clearly erroneous."  United States v. Diaz-Villafane, 874 F.2d 43, 49 (1st Cir. 1989).

A defendant convicted of conspiracy to distribute controlled substances is not automatically burdened with the total weight of the drugs involved in the conspiracy.  See Sepulveda, 15 F.3d at 1197.  The defendant, instead, is responsible for all drugs he personally handled or he anticipated handling, and for drugs involved in additional acts that were reasonably foreseeable by the defendant and were committed in furtherance of the conspiracy.  Id. Hence, the touchstone for drug weight calculations is

-14-

foreseeability.  See United States v. Innamorati, 996 F.2d 456, 488-89 (1st Cir. 1993).  Foreseeability is an inherently fact-bound determination, and requires a sentencing court to make an individualized inquiry into the details of the conspiracy known by the defendant, including his understanding of the object of the conspiracy and its foreseeable scope.  See United States v. O'Campo, 973 F.2d 1015, 1026 n.11 (1st Cir. 1992).

Based on the presentence report ("PSR"), the district court included the 19.68 grams from the November 17 transaction (which forms the basis of Carey's substantive charge) and the 23.7 grams from the October 19, 1998 transaction (for which Carey was not substantively charged) in its determination that Carey was responsible for 43.38 grams of crack cocaine.  Under the Sentencing Guidelines, a defendant has a Base Offense Level of 30 when he his responsible for "at least 35 grams but less than 50 Grams of Cocaine Base."  U.S.S.G. § 2D1.1 (c)

Carey attacks his sentence by first arguing that a discrepancy exists between the jury's finding that he was responsible for between 5 and 50 grams of crack cocaine and the fact that he was charged only with the distribution of 19.68 grams of crack cocaine for the transaction on November 17, 1998.  We fail to see any discrepancy.

Carey also claims that because he was substantively charged for only one of the four transactions (the distribution of

-15-

19.68 grams on November 17), the district court should not have used cocaine quantities from the October 19 transaction in calculating his sentence. He further argues that the jury did not find him guilty of the October 19 transaction. As we have done in the past, we reject this argument. See United States v. Amirault, 224 F.3d 9, 15 (1st Cir. 2000) ("From the standpoint of due process, a district court may properly consider uncharged conduct at sentencing as long as that conduct either is admitted or reliably proved by a preponderance of the evidence"); see generally United States v. Batista, 239 F.3d 16, 21-22 (1st Cir.), cert. denied, 534 U.S. 850 (2001) (sentencing guidelines require consideration of uncharged amounts of drugs "by including all amounts that were part of the same course of conduct or common scheme or plan as the offense of the conviction, whether or not the defendant has been charged with those transactions"). As we have already described, Carey was extensively involved in the October 19 transaction. Thus, drug quantities from that transaction were reasonably foreseeable. See Innamorati, 996 F.2d at 491.

**Affirmed.**