UNITED STATES of America, Appellee,

v.

John F. DUNN, Jr.,
Defendant, Appellant.

No. 84–1236.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1984.

Decided March 29, 1985.

---

John S. Leonard, Boston, Mass., with
whom Michael J. Keefe and The McLaugh-
lin Brothers, Boston, Mass., were on brief,
for defendant, appellant.

Daniel I. Small, Asst. U.S. Atty., Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant John F. Dunn, Jr., appeals from a jury conviction of conspiracy to extort and attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. In a two-count indictment, appellant and his uncle, William Connery, were charged with conspiring to extort and attempting to extort money from Fiore Bus Service, Inc. (FBS), under color of official right. The indictment asserted that from April 1983 through August 1983 Dunn misused his office as Chairman of the Northeast Metropolitan Regional Vocational School Committee (Northeast) in Wakefield, Massachusetts, by attempting to obtain money in exchange for using his influence to secure the School District's bus contract for Fiore Bus Service. The indictment went on to allege specific overt acts committed by Connery and Dunn in the furtherance of the conspiracy during the period from April 1983 through June 1983.

Defendant's claim of error centers around the district court's admission of evidence implicating Dunn in an extortion of FBS which took place in July and August of 1983. Unlike the first extortion attempt, which had been negotiated by Connery and had fallen through in early June, the second attempt was negotiated by James Sorrento, who had been appointed by Dunn as Chairman of the ad hoc subcommittee on school bus transportation. Sorrento was not named in the indictment nor were any of Dunn's acts in relation to Sorrento alleged as overt acts of the conspiracy. Dunn argues that the admission of the evidence of a second conspiracy had the effect of constructively amending the indictment. He also argues that this evidence could not properly have been admitted for the limited purpose of showing intent, motive, or plan under Federal Rule of Evidence 404(b) and that it was inadmissible hearsay. Finally, he claims that the admission of taped telephone conversations between Sorrento and Rudolph Fiore, President of FBS, violated Dunn's sixth amendment right to confront the witnesses against him because Sorrento did not testify at the trial.

FACTS

Prior to trial, the defendant Connery entered into an agreement with the government whereby he agreed to plead guilty and cooperate in return for the government's consideration of this cooperation in making its recommendation to the sentencing judge. Connery became the government's key witness linking Dunn to the conspiracy.

Connery testified that, beginning in the fall of 1982 and through the winter of 1983, Dunn contacted him several times and inquired whether FBS might be interested in "doing business" regarding the upcoming school bus contract. Connery stated that on April 5, 1984, he was persuaded by Dunn to call Thomas Taylor, Vice-President of FBS, and arrange a meeting to discuss the bus contract. Connery recounted on direct examination two phone conversations with Dunn in which they discussed the amount of money to be requested from FBS. On April 9, 1983, Connery met with Taylor and indicated that Dunn would help FBS obtain the school bus contract in exchange for $3,000 and one percent of the contract price per year for the contract's duration.

That same evening Connery, Dunn, and Taylor met at a political fund raising event. After a brief innocuous conversation, Connery and Taylor stepped outside and Connery gave Taylor an internal draft of the proposed bid specifications as a gesture of good faith. These documents had been distributed at the April 7 Transportation subcommittee meeting which Dunn had attended. Connery himself was not employed by Northeast. Thomas Markham, Superintendent of Schools for Northeast, testified

that while these documents were theoretically public, he would have known if an outsider had asked for a copy. Connery testified that he received these documents from Dunn and evidence submitted at the trial indicated that the first page bore the right thumbprint of Dunn.

After the April 9 meeting, Taylor and Rudolph Fiore (President of FBS) went to the government and agreed to cooperate with the Federal Bureau of Investigation in the further investigation of activities relating to the School Committee and the school bus contracts. Fiore and Taylor each agreed to tape record conversations between themselves and Connery and Dunn.

Connery did not hear from Taylor again until April 23. During this period, however, he was in constant contact with Dunn regarding the bus contract. On April 25, Taylor called and confirmed the deal with Connery, but added that Fiore wanted some guarantees. In a meeting on April 28, Taylor and Connery further discussed the terms of the contract and the agreement. During this conversation, Connery mentioned to Taylor that Sorrento might be trying to "jump in." At trial, Connery explained that Dunn had informed him that Sorrento was trying to arrange something with Kathy Fiore, Rudolph's daughter, who also worked at the bus company. Connery testified that he reported back to Dunn after this meeting with Taylor and after all subsequent conversations.

In several conversations throughout the first week of May, Taylor asked Connery to set up a meeting between Dunn and Fiore. Connery testified that he relayed this request to Dunn but that Dunn repeatedly refused to meet until he received the "up front" money. On May 6, Connery informed Taylor that Dunn insisted upon this or the deal was off.

From May 6 to May 26 Connery had no contact with FBS. On May 26 Fiore called Dunn directly in a tape recorded conversation:

RF: Is Bill Connery really speaking for you?

. . . .

RF: Well regarding, ah you know, ah, ah he called, ah he called me up about ah some sort of a deal.

JD: Whaa .. he handles a lot of my ah political things, ah, I don't know what you're talking about.

RF: Well ... he wanted certain things from me so ah about the ah bid he said to me that he wants some money down and ah and one percent a year, something like that. Ah, [i]s that ah what he ah, is he speaking for you?

JD: I, I don't know what you're talking about, I think you should call him. I talk to him I, and I really don't know what you're talking about.

RF: ... I don't know what's going on here, you know. Ah, if he's not speaking for you then that's what it is. . . .

JD: Let me say this, he handles a lot of things for me.

. . . .

RF: I don't know if I'm gonna be ah ah if be taken care of or not you know.

. . . .

JD: I'm telling you, why don't you call him, you know I don't know all the, why don't you call him? That would be the best thing. Why don't you call him?

RF: [I]f I deal through him, is everything gonna be okay with you? ... Am I gonna get your full cooperation up there?

JD: OK alright, if you need anything from me, and he says that ah it's okay, it's okay.

. . . .

When Fiore attempted to engage in further discussion, Dunn gave him Connery's phone number and told him to call Connery. Connery testified that Dunn called him to report that Fiore had telephoned and the deal was on again. Subsequently, Fiore contacted Connery and arranged a meeting for the following day.

On May 27, Connery met with Fiore and they planned that Connery and Taylor meet and exchange the $3,000 up front payment as originally agreed upon. On June 1, Connery received $1,500 from Taylor. Taylor

explained that FBS had difficulty getting the entire $3,000 out of the business at that time. During this meeting, Connery again inquired of Taylor if anything was going on between FBS and Sorrento. Taylor assured Connery that he knew nothing about any deals with Sorrento and that he would only work through Connery.

Connery testified that Dunn was angry that Connery had received only one-half of the payment. Connery stated that he suggested to Dunn that the money be returned. On June 7, Connery and Taylor met and Connery returned the $1,500. Thereafter, Connery had no further contact with Taylor or Fiore.

Connery testified that after this initial approach to FBS fell through, Dunn continued to contact him two or three times a week. According to Connery, Dunn told him that he had spoken to Sorrento and that he would probably go in on a deal with Sorrento regarding the bus contract. On June 23, the School Committee convened with the bus contract on the agenda. Markham, the school superintendent, testified that he was prepared to recommend that a new three-year contract be awarded to FBS as they were the low bidder. He was, however, never given the opportunity to make this recommendation; Dunn recognized Sorrento who moved that all bids be rejected and the contract be set out for rebidding.

According to Connery's testimony, Dunn went to Connery's house in late July and announced that he had arranged a meeting with Sorrento to find out what was going on with the FBS contract and to see "if he could get in on it." In late July or early August, Dunn told Connery in a telephone conversation that the meeting with Sorrento had taken place and that they had agreed to ask FBS for $2,000 up front and a $10,000 lump sum payment as consideration for their efforts in getting him the contract. On August 11, Dunn again telephoned Connery and told him that he was meeting with Sorrento before the school committee that evening to collect his one-half share of the $2,000 payment Sorrento

had received from FBS. Connery testified that he then told Dunn he should not meet with Sorrento because after the previous deal had fallen through he thought Dunn should "leave it alone." At the school committee meeting that night, the FBS bid was accepted by a unanimous vote. The following day, Dunn again called Connery to report that he had received the $1,000 from Sorrento and that in a couple of weeks he and Sorrento would obtain the balance of the lump sum payment and they would "take care of" Connery. Connery testified that he responded, "I don't want to be taken care of."

On August 18, Fiore met with Sorrento to discuss their arrangement. The tape of this conversation was admitted at trial. On the tape Sorrento said to Fiore, "you have all of the ... all of the right people ... that are on our team." Later, when he explained to Fiore why he needed the whole $10,000 right away, Sorrento said, "they want the whole ten.... I gotta take care of these guys." He went on to say, "No, no it isn't my package.... It's these other guys Rudy."

On August 25, the school bus contract was signed and the next day Fiore met with Sorrento to pay him the rest of the money. The tape recording of this conversation was also admitted at trial. While the main contract had been signed, at this point bids were still out on a special needs bussing contract. In response to an inquiry by Fiore on the FBS special needs bid, Sorrento said, "I spoke to the Chairman ... [a]nd we're gonna see if we can ... [t]ake care of that." Later on in the conversation, in response to Fiore's attempt to get Sorrento to tell him who else the payoff was for, Sorrento said, "We have plenty here you saw the vote." After Fiore gave him the money, Sorrento was arrested by the FBI.

Connery testified that after the Sorrento arrest, Dunn called him and reported that Sorrento had told him that "he would do the right thing." When Connery asked Dunn what he thought Sorrento meant by that, Dunn told him that he thought it

meant that Sorrento would not implicate him.

On September 7, 1983, Sorrento was indicted for attempted extortion. The indictment set the time of the attempted extortion as August 1983. Neither Dunn nor Connery were named in this indictment. On September 28, 1983, Dunn and Connery were indicted for conspiracy to extort and attempted extortion. The Dunn/Connery indictment set the time of the conspiracy and attempted extortion as April through August 1983. Sorrento was not named in this indictment. He was separately tried and convicted prior to the Dunn/Connery trial.

*Constructive Amendment*

 Dunn contends that the admission of the Sorrento evidence resulted in a constructive amendment of the indictment returned by the grand jury. A constructive amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." *Gaither v. United States,* 413 F.2d 1061, 1071–72 (D.C.Cir.1969). An amendment of the indictment is considered prejudicial per se and grounds for reversal of a conviction whether it is brought about by a literal alteration of the words of the indictment, *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), a jury instruction which modifies the offense charged in the indictment, *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), or the admission of evidence of an offense not charged by the grand jury, *United States v. Beeler,* 587 F.2d 340 (6th Cir.1978), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

Dunn's claim of constructive amendment is based in part upon his view of the scope of the indictment. He argues that because the indictment names only Connery and Dunn as coconspirators and alleges only overt acts relating to the Dunn/Connery approach to FBS, the scope of the conspiracy charged was limited to this. Under this construction of the indictment, since the conspiracy between Dunn and Sorrento was not explicitly charged it fell outside the compass of the indictment. Dunn claims that this is borne out by the evidence. He maintains that once Connery returned the $1,500 to Taylor, the Dunn/Connery conspiracy was over. Dunn may have gone on to conspire with Sorrento, but Connery was not a part of this agreement. In fact, Connery advised Dunn not to get involved with Sorrento's plan and told Dunn he did not want to be "taken care of" out of the payoff. This, according to Dunn, shows that Connery did not manifest the affirmative cooperation necessary to make him a coconspirator with Dunn and Sorrento in their extortion scheme. *See United States v. Flaherty,* 668 F.2d 566, 581 (1st Cir.1981). Without both Connery and Dunn, there was no continuation of the initial conspiratorial agreement and the Dunn/Sorrento conspiracy could only be a separate and independent conspiracy.

Dunn also argues that the government's own view of the evidence and indictment support his position. The government's trial memorandum treated evidence of the Dunn/Sorrento extortion attempt differently than it treated evidence of the Dunn/Connery extortion attempt. The memorandum indicated that the Dunn/Sorrento evidence would be offered to show a similar bad act under Federal Rule of Evidence 404(b).[1] Under Rule 404(b), this evidence would be admissible only for the limited purposes specified in the rule. If the government viewed the evidence as showing one continuing conspiracy and the indictment as charging one continuing conspiracy, it would not need to invoke Rule 404(b) when it offered the Sorrento evidence because it would be admissi-

---

1. Fed.R.Evid. 404(b) provides:

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ble as direct evidence of the offense charged. Even on appeal, the government's brief indicates it believed that the indictment was in some sense limited to the first agreement. The government argues that while the facts reveal one continuing conspiracy, the indictment charged "one of the lesser conspiracies," *i.e.*, not a general agreement to extort money from FBS but the more limited agreement to have Connery extort money from FBS.

Dunn's position is that the evidence shows that there were two distinct conspiracies and the indictment reflected this by charging only one conspiracy. Consequently, he argues that when the district court admitted evidence of the Dunn/Sorrento conspiracy without limitation, it permitted evidence of a distinctly different crime not charged by the grand jury to come before the jury. This, therefore, created the possibility that Dunn was convicted on the basis of his participation in the second conspiracy and not on the basis of his participation in the first conspiracy, the one charged. Under *Stirone v. United States*, the mere possibility that the conviction rests upon an offense not charged by the grand jury is sufficient to call for reversal of the conviction. 361 U.S. at 219, 80 S.Ct. at 274.

The government contends that even though the indictment charged only a subpart of the overall scheme there was only a single continuing conspiracy. In support of its position that the Dunn/Connery attempt and the Dunn/Sorrento attempt were parts of a continuing conspiracy, the government points first to the rule that a conspiracy is "presumed to continue until the contrary is shown." *United States v. Stromberg*, 268 F.2d 256, 263 (2d Cir.1959). Since the basic aim of the conspiracy—to extort money from FBS—had not been accomplished through Connery's negotiations, it had not come to a natural termina-

tion. When Dunn informed Connery that a new method of achieving their common goal was available and that he would pursue it, the conspiracy continued. The government next argues that Connery remained a coconspirator throughout the Sorrento approach because he did not withdraw from the conspiracy. Under conspiracy law, withdrawal requires affirmative action on the part of the coconspirator. *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). It is the government's contention that Connery's statements to Dunn advising Dunn not to go through with the Sorrento deal and telling him that he did not want any share of the money were not sufficient to show withdrawal or two conspiracies. As long as Connery continued to be a member of the conspiracy during the period of the Sorrento extortion attempt, the initial conspiracy was neither terminated nor abandoned and the Sorrento approach was simply another avenue tried by the conspirators to achieve their goal of extorting money from FBS.

We surmise from the government's brief that it contends that as long as the Dunn/Sorrento attempt was made as a result of the initial Dunn/Connery conspiracy and there was in fact only one conspiracy under the law, there could be no constructive amendment to the indictment even though it views the indictment as covering only a "lesser conspiracy" or a conspiracy within a conspiracy. Evidence of the Dunn/Sorrento extortion attempt went to prove the same conspiracy as did evidence of the Dunn/Connery extortion attempt. It would appear from the government's reasoning, therefore, that when a part of a conspiracy is charged in an indictment, it is as if the whole conspiracy has been charged and proof at trial may extend to the whole conspiracy.[2]

2. It is not clear to us whether the government's position that there was one conspiracy encompassing both approaches is genuinely held or whether it has advocated this only in order to support the district court's evidentiary rulings. This view of the conspiracy is somewhat incon-

gruous given the government's position on the indictment and this incongruity is reflected by the theories it has put forth justifying the admission of the Sorrento evidence. Despite the fact that the Sorrento approach was relevant to the conspiracy count because it was part of the

■ We need not decide whether the government's position is correct for there is another construction of the indictment which, though not argued by the parties, we find compelling. In relevant part the indictment reads:

From in or about April through August, 1983, FBS submitted bids for a new bus service contract with the School District to commence when its then-existing bus contract expired....

2. From in or about April, 1983, through in or about August, 1983, in the District of Massachusetts, the defendants,

John F. Dunn, Jr., and

William Connery

did knowingly, willfully and unlawfully conspire to commit extortion....

The indictment then goes on to allege overt acts from April 9 to June 1 relating to the Dunn/Connery attempt. Because the indictment sets the time period for the conspiracy from April through August, it covers both the Dunn/Connery attempt and the Dunn/Sorrento attempt. Indeed, we can see no reason for the inclusion of the months of July and August in the indictment other than to cover the second round of bidding and the second extortion attempt. The fact that the overt acts alleged relate only to the first attempt in no way limits the proof of the conspiracy to those acts, *United States v. Morales*, 677 F.2d 1, 2 (1st Cir.1982). The conspiracy count, therefore, cannot be considered to be limited in scope to the overt acts alleged. We find that the indictment charged a single continuing conspiracy encompassing both the first and second extortion attempt.

■ We agree with the district court that the evidence showed one continuing conspiracy. These were not merely similar extortion attempts. The goal of each extortion attempt was exactly the same. Each attempt involved the same bus company, the same contract, and very similar monetary arrangements. The failure of the first attempt led directly to the second attempt. The overall plan was the same for each: get money from FBS in exchange for votes on the 1983–86 Northeast Metropolitan Vocational School District bus contract. *Cf. Blumenthal v. United States*, 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1948) (presence of overriding scheme and common end shows single conspiracy).

■ Furthermore, each of the members of the 'first' conspiracy were members of the 'second' conspiracy. Although Connery appears to have taken a more passive role during the latter part of the conspiracy, he was the prime mover during the early part of the scheme. Defendant alleges that Connery withdrew from the conspiracy after the first attempt; however, "mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." *United States v. Phillips*, 664 F.2d 971, 1018 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d

same conspiracy charged in the indictment, the government appears to believe that the limited nature of the indictment prevents it from offering evidence of the Sorrento approach generally. We infer this because no such argument was made in their brief. Rather, they have argued that the evidence was admissible as *res gestae, i.e.,* other acts inextricably intertwined with the offense charged, or as probative of Dunn's intent under Rule 404(b). This puts the government in the somewhat peculiar position of arguing that no constructive amendment was made because the evidence was probative only of the offense charged while at the same time appearing to say that evidence of the Sorrento approach could not be introduced generally because it was excluded from the direct offense

charged by the indictment. Certainly, the government's attempt to get the Sorrento evidence in under Rule 404(b) is more congruous with a view of the Sorrento approach as a separate and distinct conspiracy.

Had the indictment been limited to the months of April, May and June, we might have been forced to resolve this somewhat paradoxical problem. As it is, however, we have taken a different view of the indictment. We point out this incongruity in the government's position only to indicate the difficulties which may arise if the government clearly limits a conspiracy indictment to part of an overall conspiracy yet attempts to introduce evidence of the rest of the conspiracy.

1354 (1982), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). In order to show withdrawal, a conspirator must act affirmatively to either defeat or disavow the purpose of the conspiracy. *United States v. United States Gypsum Co.,* 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978). Clearly, Connery took no action to defeat the conspiracy. Nor can it be said that he effectively disavowed it by either advising Dunn to "leave it alone" or by refusing a share in the payoff. It is not sufficient for a conspirator to simply advise against a course of action. Disagreement is to be expected in any group endeavor. The special danger to society inherent in conspiracy is that the commitment of several individuals to a criminal purpose increases the likelihood that criminal activity will occur. "[T]he future is no longer governed by [one] ... will alone; others may complete what [one conspirator] ... has had a hand in starting, even if he [or she] has a change of heart." Model Penal Code § 5.03 commentary at 97 (Tent.Draft No. 10, 1960). At some point disagreement may lead to disavowal, but we see no sign of that here. The mild disagreement expressed by Connery on the very day that Dunn was to collect the first payoff and vote on the contract was not a "communication to his [coconspirator] ... that he has abandoned the enterprise and its goals." *United States v. Steele,* 685 F.2d 793, 803–04 (3d Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Certainly it did not have that effect, since Dunn called back the next day to let Connery know he would get a share of the payoff.

■ While Connery's expression of disinterest in a share of the payoff might be considered more indicative of a disavowal,

it came much too late to validate Dunn's claim of two conspiracies. Connery's withdrawal, if it was a withdrawal, came only after the conspiratorial objective had been substantially accomplished. The votes had been cast, the contract approved, and part of the payoff had been collected. Connery's continued presence in the conspiracy up to this point was sufficient to prove that there was in fact one overall conspiracy.

■ Since the indictment charged a single continuing conspiracy to extort money from FBS for contract bids made between April and August and the evidence offered at trial proved just such a continuing conspiracy, there was no constructive amendment of the indictment. The proof adduced at trial mirrored the offense charged by the grand jury. *United States v. Kelly,* 722 F.2d 873, 876 (1st Cir.1983).

*Evidentiary Issues*

■ Our determination that there was only one conspiracy covering both the Dunn/Connery and Dunn/Sorrento attempt makes defendant's argument that the Dunn/Sorrento evidence was inadmissible under Federal Rule of Evidence 404(b) inapposite. The Dunn/Sorrento evidence was directly relevant to the offense charged, *i.e.,* an extortion conspiracy running from April to August, and was, therefore, generally admissible. The district court properly refused to make Rule 404(b) findings relative to the admission of this evidence.[3]

■ We also reject defendant's contention that the statements of Sorrento contained on the tapes played for the jury were inadmissible hearsay because they were not statements made against his penal interest. Fed.R.Evid. 804(b)(3).[4] De-

---

**3.** Even if Rule 404(b) had been the only proper avenue for the admission of the Sorrento evidence, defendant failed to object to Connery's extensive testimony about the Sorrento approach, objecting only to the admission of the Sorrento tapes. Thus, as to the Connery testimony, defendant is considered to have waived his objection. *Saville v. United States,* 400 F.2d 397, 400 (1st Cir.1968), *cert. denied,* 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 768 (1969). *But*

*see Cooper v. Picard,* 428 F.2d 1351 (1st Cir. 1970). The prior admission of the Connery testimony would have made a finding of prejudice highly unlikely. The tapes themselves were much less damning of Dunn than Connery's testimony.

**4.** Fed.R.Evid. 804(b)(3) provides in pertinent part:

fendant overlooks Federal Rule of Evidence 801(d)(2)(E), which provides that "statements by a coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay. The statements made by Sorrento would not have been hearsay even if the Dunn/Sorrento attempt had grown out of a wholly different conspiracy. *United States v. Postal*, 589 F.2d 862, 886 n. 41 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). The coconspirator exception applies as long as it was "more likely than not that the declarant and the defendant were members of *a* conspiracy when the hearsay statement was made...." *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977).[5] In this case, the district court's finding of one conspiracy involving Dunn, Connery and Sorrento more than amply supported the admission of the Sorrento tapes under the *Petrozziello* standards.

*Confrontation Clause*

 Defendant's final argument is that the admission of the Sorrento-Fiore tapes constituted a violation of his sixth amendment right of confrontation. U.S. Const. amend. VI. Prior to the trial, Sorrento stated that he would exercise his fifth amendment right not to testify. As a result, Sorrento was not called as a witness and defendant was not provided with the opportunity to cross-examine him. The confrontation clause, however, does not work as an absolute bar to the admission of hearsay. *Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970).[6] As long as the hearsay statements carry sufficient "indicia of reliability" to assure the trier of fact of an adequate basis for evaluating the truth of the decla-

ration, an opportunity to cross-examine is not required. *Id.* at 89, 91 S.Ct. at 220.

This court has repeatedly rejected confrontation clause challenges to the admission of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). *E.g., United States v. Bautista*, 731 F.2d 97, 100 (1st Cir.1984); *United States v. DiGregorio*, 605 F.2d 1184, 1189 (1st Cir.), *cert. denied*, 444 U.S. 937, 944, 983, 100 S.Ct. 287, 302, 489, 62 L.Ed.2d 197 (1979); *United States v. Klein*, 522 F.2d 296, 301 (1st Cir.1975); *United States v. Clayton*, 450 F.2d 16, 20 (1st Cir.1971), *cert. denied*, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972). Coconspirator statements are considered presumptively reliable as declarations against interest. *Clayton*, 450 F.2d at 20. Defendant argues that the taped statements of Sorrento were not reliable because Sorrento was a convicted felon and because he had a motive to falsify, *i.e.*, he needed to convince Fiore that he controlled a lot of votes. We need not take the first argument too seriously. The conviction in question was for the August extortion of FBS and clearly has no bearing on whether Sorrento may have been lying. Nor are we convinced that Sorrento had a strong motive to falsify. After all, these statements were made after the vote had been taken and the contract approved. It also must be noted that the government played no role in Sorrento's absence from the trial. We find, therefore, that these statements were sufficiently reliable to justify placing them before the jury.

*Affirmed.*

---

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

**5.** Of course, if the Sorrento statements had grown out of a second conspiracy, there would have been a separate hurdle of relevancy to surmount. Fed.R.Evid. 404.

**6.** We recognize that under the Federal Rules of Evidence, Sorrento's statements are not hearsay by express definition; they do, however, have all the attributes of hearsay.