# United States Court of Appeals
## For the First Circuit

No. 11-1914

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT S. CIRESI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi,  U.S. District Judge]

Before

Lynch, Chief Judge,
Souter, Associate Justice,[*]
and Lipez, Circuit Judge.

Martin G. Weinberg, with whom Kimberly Homan and John Cicilline were on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

October 5, 2012

---

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LIPEZ, Circuit Judge**. After a jury trial in the United States District Court for the District of Rhode Island, Robert Ciresi, a seventy-eight-year-old North Providence attorney, was convicted on bribery, extortion, and conspiracy charges stemming from his involvement in a scheme to purchase the votes of three corrupt town councilmen on two zoning matters. During the trial, the district court admitted into evidence under Federal Rule of Evidence 801(d)(2)(E) a number of recorded statements about Ciresi made by one of the councilmen to a government informant. On appeal, in seeking a new trial, Ciresi argues that some of these statements should have been excluded as hearsay, and challenges the admission of all the statements on constitutional grounds under the Sixth Amendment's Confrontation Clause. He also claims that the district court erred in calculating his sentence under the United States Sentencing Guidelines ("Guidelines"). We affirm.

**I.**

**A. Factual Background**

We set forth the facts in the light most favorable to the jury's verdict. See United States v. Rodríquez-Rodríquez, 663 F.3d 53, 55 (1st Cir. 2011); United States v. Mitchell, 596 F.3d 18, 20 n.1 (1st Cir. 2010).

**1. The Supermarket Bribe**

In the fall of 2008, Richard Baccari, a commercial developer represented by Ciresi, applied to the seven-member North

Providence Town Council ("Town Council") to rezone a plot of residential land on which he hoped to build a supermarket. Shortly thereafter, a local official overheard one of the councilmen, John Zambarano, telling another councilman, Raymond Douglas, that he was eager to approve Baccari's application because he "could really use the money." Zambarano's comment was relayed by the local official to the Federal Bureau of Investigation ("FBI"), which enlisted another councilman, Paul Caranci, to join the extortion scheme as a government informant. Caranci was directed to record his conversations with Zambarano, Douglas, and Joseph Burchfield, the third corrupt councilman.

On February 9, 2009, the day before the zoning vote, Zambarano told Caranci that Baccari had agreed to pay $25,000 in exchange for approval of his application. Caranci's share was to be $4,000. Zambarano explained that no payments would be made until the vote was completed: "I'm meeting [Baccari] and Bobby Ciresi about an hour after the meeting, and he's giving, and he's giving me the money. So . . . I'll give everybody theirs too, and then Wednesday after work I'll . . . give you the $4,000." Zambarano also said that Ciresi had arranged for him to meet privately with Baccari to negotiate the bribe amount and that Ciresi had communicated to him that Baccari wanted his application approved with no conditions. Zambarano left Caranci with the impression that there would be other opportunities to mine Baccari,

or different developers, for money in the future: "[T]here's something else coming down the road, in the future . . . we can all be part of this again."[1]

The next day, the Town Council unanimously approved Baccari's application. After the vote, FBI agents tailed Zambarano's car to an empty restaurant parking lot. A few minutes after Zambarano arrived, a car registered to Ciresi's wife entered the lot from the opposite direction and parked for several minutes alongside Zambarano's car, so that the driver's side windows aligned. The car's driver was an older white male with salt and pepper hair who was wearing a suit. This limited description was consistent with Ciresi's appearance. Cell phone records also show that Ciresi received a call from Zambarano one minute before the car registered to his wife arrived at the parking lot and that Ciresi's cell phone was within one mile of the lot when the call was placed.

The following day, February 11, 2009, Zambarano and Caranci met in the driveway of Zambarano's home. Zambarano handed Caranci $4,000 and then said that he "got this last night after the meeting." Zambarano proceeded to describe in detail how Ciresi had brokered his negotiations with Baccari, noting that Zambarano was

---

[1] Ciresi challenges the admission of the February 9, 2009, conversation on constitutional grounds only; he attacks the admission of the remaining conversations on both evidentiary and constitutional grounds.

-4-

"very close to Bobby Ciresi" and that Ciresi had vouched for him to Baccari by advising Baccari that "he doesn't want to talk to anybody else." Zambarano also referred to other extortion opportunities that might arise "in the future" and said he would demand a larger bribe "next time."

### 2. The Mill Bribe

In March 2010, Zambarano told Caranci that he "might be working on something else" on behalf of the corrupt councilmen. Two developers, Vincent Coccoli and Kevin O'Sullivan, had applied to the Town Council to rezone an industrial mill complex that they hoped to convert into apartments. Zambarano was attempting to extract a bribe from them in exchange for approval of their application. Ciresi represented these developers as well.

On March 15, 2010, Zambarano informed Caranci that Ciresi was "going to try" to arrange a bribe but harbored doubts about his ability to do so because he had never before represented these developers. Two weeks later, on March 28, 2010, Zambarano reported to Caranci that he had asked Ciresi about negotiating a bribe with Coccoli and that Ciresi had replied: "I don't even know him . . . so let me feel him out." Zambarano also said that Ciresi had subsequently warned him against approaching Coccoli for a bribe but had suggested that O'Sullivan could be approached by his former

-5-

business partner, Edward Imondi, whom Zambarano knew.[2]  Zambarano also told Caranci that although Ciresi had received "a few thousand dollars" for his involvement in the supermarket bribe, "[h]e seems like he doesn't want nothing doin" in the mill bribe.

On April 4, 2010, Zambarano notified Caranci that Ciresi was "out" but that Imondi had helped arrange a bribe from O'Sullivan and would receive a share of this bribe, just as Ciresi had received a share of the supermarket bribe.  In response to Caranci's questioning about how the bribes were being divided up, Zambarano disclosed that his own share of the supermarket bribe had been $2,200 larger than Caranci's because he had done more legwork.

On April 26, 2010, O'Sullivan delivered a down payment on the $75,000 bribe to Imondi, who retained his own share and passed along the remainder to Douglas and Burchfield.  The Town Council unanimously voted to approve the rezoning application the same day.

## B.  Procedural History

Ciresi was indicted on August 19, 2010[3] for one count of bribing a local government official, in violation of 18 U.S.C. § 666(a)(2), one count of aiding and abetting an extortion, in violation of 18 U.S.C. §§ 2 and 1951, and one count of conspiring

---

[2] Phone records indicate that Zambarano and Ciresi spoke twice on March 16, 2010, and that Ciresi called Imondi three minutes after their second conversation.

[3] Zambarano, Douglas, Burchfield, and Imondi were also indicted.  They pleaded guilty to the charges against them.

to commit the same crimes, in violation of 18 U.S.C. § 371. The bribery and extortion charges related only to the supermarket bribe. The conspiracy charge also related to the mill bribe.

The indictment included references to a number of recorded statements about Ciresi made by Zambarano to Caranci in the course of both bribes. The government sought to introduce these statements during trial. Zambarano did not testify. Ciresi moved to exclude as hearsay any of Zambarano's statements that postdated the completion of the supermarket bribe. He also objected to the admission of all of Zambarano's statements to Caranci, including the February 9, 2009, conversation, under the Sixth Amendment's Confrontation Clause. Consistent with the procedures we outlined in United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980), the district court provisionally admitted the statements into evidence. Then, in response to Ciresi's renewal of his hearsay objection at the trial's end, the court ruled that they were properly admitted as nonhearsay under Federal Rule of Evidence 801(d)(2)(E). The district court also summarily rejected Ciresi's constitutional challenge.

Ciresi was convicted on April 26, 2011. On August 3, 2011, he received a sentence that included a 63-month term of imprisonment. The district court's Guidelines sentencing calculation took into account both the supermarket bribe and, over Ciresi's protest, the mill bribe. This timely appeal followed.

## A.  The Hearsay Challenge

The government sought to admit Zambarano's out-of-court statements under Federal Rule of Evidence 801(d)(2)(E).  The rule provides that a statement made by a defendant's coconspirator "during the course of and in furtherance of the conspiracy" may be introduced as the nonhearsay admission of a party opponent.  Fed. R. Evid. 801(d)(2)(E); see also United States v. Díaz, 670 F.3d 332, 348 (1st Cir. 2012); United States v. Fogg, 666 F.3d 13, 15 (1st Cir. 2011).  The proponent of such a statement must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy. See United States v. Famania-Roche, 537 F.3d 71, 76 (1st Cir. 2008); United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002).  A district court's determination "as to whether this burden has been met is known in this circuit as a Petrozziello ruling," after our holding in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977).  United States v. Mitchell, 596 F.3d 18, 23 (1st Cir. 2010); see also Famania-Roche, 537 F.3d at 75.

As we explained in Ciampaglia, a district court is not required to make a Petrozziello ruling prior to admitting a statement under Rule 801(d)(2)(E).  Instead, the court may admit the statement provisionally when it is introduced, deferring a

final decision until the close of evidence. See 628 F.2d at 638; see also Bradshaw, 281 F.3d at 283. To preserve a challenge to a district court's Petrozziello ruling, a defendant must object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence. See United States v. Avilés-Colón, 536 F.3d 1, 13-14 (1st Cir. 2008). We review preserved challenges for clear error. See United States v. Fernández-Hernández, 652 F.3d 56, 74 (1st Cir. 2011); United States v. Thompson, 449 F.3d 267, 273 (1st Cir. 2006). Unpreserved challenges are reviewed for plain error. See Fernández-Hernández, 652 F.3d at 74.

In this case, when the first of Zambarano's recorded statements to Caranci was introduced at trial, Ciresi objected on hearsay grounds, citing Petrozziello. When the next statement was introduced, Ciresi objected again, noting that he construed our precedent to require him to interrupt proceedings with a hearsay objection each time one of Zambarano's statements was mentioned. The government agreed to "waive any argument that he would have to [object] every time," and the district court permitted Ciresi to lodge a continuing objection to all of Zambarano's recorded statements. At the close of evidence, Ciresi renewed his hearsay objection, again adverting to Petrozziello.

In light of these circumstances, we review Ciresi's challenge for clear error. "This deferential standard of review

places a heavy burden on a defendant seeking to overturn a . . . Petrozziello ruling." United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003).

Ciresi raises three arguments in his hearsay challenge to Zambarano's statements. First, he contends that the supermarket bribe and the mill bribe were in fact separate conspiracies involving separate actors, and that he never participated in the mill bribe. Second, he argues that even if the two bribes were part of the same scheme, he affirmatively withdrew from the conspiracy before the mill bribe occurred. Third, he asserts that Zambarano's statements were not made in furtherance of the conspiracy. We address each argument in turn.

### 1. Separate Conspiracies

Ciresi argues that the district court should have drawn a hard line between the supermarket bribe and the mill bribe because they were separate conspiracies and he only partook in the former. To determine whether a set of criminal activities constitutes a single conspiracy, we generally look to three factors: (1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants. See United States v. Dellosantos, 649 F.3d 109, 117 (1st Cir. 2011); United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008). None of these factors is conclusive standing alone; instead, "[w]e look to the totality of the evidence to see

if it supports a finding of a single conspiracy." United States v. Soto-Beniquez, 356 F.3d 1, 19 (1st Cir. 2003). A general scheme may exist "notwithstanding variations in personnel and their roles over time." United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000) (quoting United States v. Bello-Perez, 977 F.2d 664, 668 (1st Cir. 1992)) (internal quotation marks omitted).

These factors all point toward the existence of a single conspiracy. Broadly construed, see Dellosantos, 649 F.3d at 117, the bribes in this case shared a common goal: extorting clients of Ciresi who had submitted rezoning applications to the Town Council. The second factor, overlap among the participants, "is satisfied by the pervasive involvement of a single core conspirator, or hub character." Id. (quoting United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 1999)) (internal quotation marks omitted). Zambarano played such a role here - he participated in both bribes, shuttled information back and forth among the participants, and facilitated the activities of the various conspirators.[4] His consistent involvement strongly supports the existence of overlap between the two schemes.

---

[4] Ciresi himself was also arguably part of the conspiracy's "hub." Due to his representation of the parties seeking to bribe the councilmen, he had relationships to and crucial information about all the relevant players. With Zambarano's aid, he used these connections to link the conspirators with one another and suggested useful means of effectuating their common goals. Ciresi and Zambarano can therefore be seen as joint members of the "hub." See Newton, 326 F.3d at 255 n.2 (noting that "individual or group of individuals" may comprise hub of "single, illegal enterprise").

The third element, interdependence, addresses "whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Id. (citations omitted) (quoting Mangual-Santiago, 562 F.3d at 422). "Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). Here, each of the participants understood the bribes' success to hinge on the others' cooperation. For example, each of the three councilmen knew the others' votes were potentially necessary for the seven-member Town Council to approve the rezoning applications.

Hence, all of Zambarano's statements about Ciresi fell within the course of a conspiracy of which he was a member.

## 2. Withdrawal

Ciresi next contends that even if the two bribes were part of the same scheme, he withdrew from the conspiracy before the participants engaged in the mill bribe. See United States v. Abou-Saada, 785 F.2d 1, 7-8 (1st Cir. 1986); United States v. Mardian, 546 F.2d 973, 978 n.5 (D.C. Cir. 1976) ("Had [the defendant] withdrawn, the declarations of coconspirators uttered after the date of his withdrawal would not be admissible against him."). "In order to withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy." United States

-12-

v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam); see also United States v. Pizarro-Berríos, 448 F.3d 1, 10 (1st Cir. 2006). "Typically, that requires either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002) (quoting Juodakis, 834 F.2d at 1102) (internal quotation marks omitted). Moreover, the "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." Juodakis, 834 F.2d at 1102 (quoting United States v. Dunn, 758 F.2d 30, 37 (1st Cir. 1985)) (internal quotation marks omitted). This standard is "strict" and not easily met. Id.

Ciresi's argument relies primarily on a statement made during Zambarano's March 28, 2010, discussion with Caranci regarding the pending mill bribe. Zambarano reported that Ciresi "seems like he doesn't want nothing doin." Zambarano also told Caranci on April 4, 2010, that Ciresi was "out."

These remarks are ambiguous, however, and do not clearly evince a "change of heart or abandonment." United States v. Arboleda, 929 F.2d 858, 871 (1st Cir. 1991). Indeed, Zambarano's statements are even more equivocal when viewed in their full context. As the district court noted in its Petrozziello ruling, Ciresi played a crucial role in facilitating the mill bribe. According to Zambarano, Ciresi said he was "going to try" to

-13-

arrange a bribe and then steered Zambarano away from Coccoli and toward O'Sullivan, proposing Imondi as a middleman. Phone records corroborate that Ciresi spoke to Zambarano and Imondi in quick succession on March 16, 2010, during the mill bribe's planning stage. Against this backdrop, that Ciresi was "out" could easily have just meant that he would not again directly broker negotiations or hand-deliver the bribe, as he had with the supermarket bribe. See Juodakis, 834 F.2d at 1102. As a result, we are satisfied that Ciresi's membership in the conspiracy extended through the mill bribe phase, and any statement made by Zambarano in the context of either bribe was made during the course of a conspiracy involving Ciresi.

### 3. In Furtherance of the Conspiracy

Ciresi argues that even if he was a participant in the entire conspiracy, any statements about Ciresi's role that Zambarano made after the completion of the supermarket bribe were mere narratives of past events that did not satisfy Rule 801(d)(2)(E)'s "in furtherance" requirement. See, e.g., United States v. Warman, 578 F.3d 320, 338 (6th Cir. 2009) ("[M]ere idle chatter or casual conversation about past events is not considered a statement in furtherance of the conspiracy.") (quoting United States v. Darwich, 337 F.3d 645, 657 (6th Cir. 2003)); United States v. Santos, 20 F.3d 280, 286 (7th Cir. 1994) ("[N]arrative discussions of past events . . . do not satisfy the 'in

-14-

furtherance' requirement of Rule 801(d)(2)(E).").

There are three such statements, or groups of statements. We consider each in turn, keeping in mind that "a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002). "To be deemed 'in furtherance,' a statement 'need not be necessary or even important to the conspiracy, or even made to a coconspirator, as long as it can be said to advance the goals of the conspiracy in some way.'" Id. (quoting United States v. Martínez-Medina, 279 F.3d 105, 117 (1st Cir. 2002)). It is immaterial that the person to whom the statement is made is a government informant, like Caranci, as long as the statement itself was made in furtherance of the common scheme. See Avilés-Colón, 536 F.3d at 15.[5]

The first statements at issue were made on February 11, 2009, the day after the Town Council approved Baccari's rezoning

_____

[5] We note that while a government agent cannot be considered a part of a conspiracy, this rule "has relevance only in situations where the conspiracy involves only [one] defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire . . . ." United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987) (alteration in original) (citation omitted) (quoting United States v. Martino, 648 F.2d 367, 405 (5th Cir. Unit A June 1981)) (internal quotation mark omitted). By contrast, the Rule 801(d)(2)(E) analysis focuses on whether the speaker "regarded" or "viewed" the listener as a coconspirator when making the statements, regardless of whether the listener truly shared the conspiracy's goals. Avilés-Colón, 536 F.3d at 15-16.

application.  After paying Caranci his share of the supermarket bribe, and thereby effectively bringing that bribe to a close, cf. United States v. Fields, 871 F.2d 188, 199 (1st Cir. 1989) (stating that conspiracy had not ended because "[p]roceeds . . . were still to be distributed"), Zambarano hinted that other bribes might be in store for them and described how simple the supermarket bribe had been to arrange:

> I went down to Baccari's. . . . Because remember that all the councilmen were invited to go down there. . . . Well, what happened was I'm very close to Bobby Ciresi.  I'm very close to him.  And he said to me, "John, I'm gonna make you last," he said, "Because if you want, if youse want something, you're the guy that's gonna do the deal.  I already told [Baccari] that he doesn't want to talk to anybody else about it."  So I went down there and we, we showed [Baccari] the plans and he said to Bobby, "Did you say you had to go bring something to my secretary?"  That was a way of getting him out of the office. . . . He says . . . "Now we're here to do business."  So I said "All right."  And I said, "How does twenty-five sound?"  He said, "That's fine."  Just like that.

Zambarano added that he "could have said fifty" and that "next time" he would ask for more money.

These comments were not simply idle chatter or narratives of past events.  They were calculated to impress upon Caranci the ease with which other bribes could be solicited in the future.  As such, they set the table for the mill bribe and furthered the conspiracy.  See United States v. Pelletier, 845 F.2d 1126, 1128 (1st Cir. 1988) ("Statements . . . made for the purpose of inducing

-16-

continuing participation in the conspiracy, are statements made in furtherance of the conspiracy."); see also United States v. Sepulveda, 15 F.3d 1161, 1181 (1st Cir. 1993) ("[T]he sharing of pertinent information about a conspiracy's mode of operation furthers the conspiratorial ends . . . ."). They also served to reassure Caranci that Zambarano was looking out for the conspiracy's profitability, see Newton, 326 F.3d at 260, and to familiarize Caranci with the respective roles Zambarano and Ciresi had played in the supermarket bribe and, presumably, would continue to play down the road, see Avilés-Colón, 536 F.3d at 15.

The second group of statements was made on March 28, 2010. In a conversation about the mill bribe's progress, Zambarano told Caranci that Ciresi had never before worked with Coccoli and was apprehensive about approaching him for a bribe. Zambarano then alluded to Ciresi's role in the supermarket bribe: "Bobby was involved in the other one. . . . See him and . . . Baccari they were like that. So it was easy." He also repeated the details of how Ciresi had introduced him to Baccari, mentioning for the first time that Ciresi had been unaware of Caranci's involvement in the supermarket bribe but that he had recently notified Ciresi that the mill bribe would have to be split four ways among the councilmen:

> [T]he last one Bobby was a party to. . . .
> [H]e was the one that set up the meeting with
> . . . Baccari. And I went down there and I
> was, sat in his office. I told you that
> story. And he said you know what's going on
> and I told him what was going on. . . . So

-17-

. . . we gave Bobby some money.  We gave him a few thousand dollars . . . but this time I said, Bob, there's four votes, I said it's gonna be four. . . . [H]e never even knows who was involved with the last time.  He just, Bobby Ciresi, he just knows with me.

These statements plainly were in furtherance of the ongoing conspiracy.  They were intended to reassure Caranci that Zambarano was dealing squarely with him and that he would receive a fair share of the mill bribe.  See United States v. Siegelman, 640 F.3d 1159, 1181 (11th Cir. 2011) ("[S]tatements between conspirators which provide reassurance [or] serve to maintain trust and cohesiveness among them . . . further the ends of the conspiracy . . . ." (second alteration in original) (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983))).  In addition, they helped explain why, by comparison to the supermarket bribe, the mill bribe was proceeding slowly: there was no close personal relationship, such as had existed between Ciresi and Baccari, to speed along the mill bribe.  Therefore, they furthered the conspiracy by keeping Caranci "abreast of current developments and problems facing the group." United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (quoting United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000)); see also United States v. Rivera-Donate, 682 F.3d 120, 131-32 (1st Cir. 2012); Diaz, 670 F.3d at 349.

The third group of statements was made on April 4, 2010.  In the course of a conversation about how the mill bribe would be divided, Caranci expressed some concern about whether his share of

-18-

the supermarket bribe had been equivalent to everyone else's, saying that he "felt bad after . . . thinking about it." Zambarano explained that his portion had been $2,200 larger because he had assumed the risk of meeting face-to-face with Baccari:

> I went there twice in this fucking guy's office, face to face with, ah, Richard Baccari negotiating this deal. . . . Well, when I went down to Richard's, that was the first time I ever did something like that, right, and he said come on in, come on in. Now Bobby was like, Bobby Ciresi's like this with him so he knew. And Bobby says "He does that all the time, Johnny, but you gotta go talk to him."

Zambarano then described how he also had been the one who rendezvoused with Ciresi after the rezoning vote:

> I called Bobby on his cell phone and I said what's the plan? He said meet him down there in the parking lot. So I go down there in the parking lot. So I go down there I got, I was in this car, right. I pulled up, his . . . his Mercedes, whatever were parked this way. There was, I pulled up close, close, I opened the window, he threw the money in it, a bag right on my lap. He says thank you, bud. . . . So that wasn't worth $2,200 more? . . . . I mean I'm, I'm, I'm a pretty fair guy.

From Zambarano's perspective, these statements served to placate Caranci and forestall any dissension among the councilmen in the weeks leading up to the mill bribe. As such, they were in furtherance of the charged conspiracy. See Siegelman, 640 F.3d at 1181; Newton, 326 F.3d at 260.

In sum, Zambarano's recorded statements to Caranci about Ciresi were all made during the course of and in furtherance of an

ongoing, multi-phase conspiracy in which Ciresi was an active member. Accordingly, they were admissible as nonhearsay under Rule 801(d)(2)(E). There was no clear error in the district court's Petrozziello ruling.

## B. The Constitutional Challenge

Because Zambarano did not testify during the trial, and hence was not subject to cross-examination, Ciresi argues that the admission of his recorded statements violated the Confrontation Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

As Ciresi acknowledges, however, the Supreme Court has held that the Confrontation Clause only applies to statements that are deemed testimonial. Davis v. Washington, 547 U.S. 813, 821 (2006). The Court has also commented that statements made unwittingly to a government informant are "clearly nontestimonial." Id. (citing Bourjaily v. United States, 483 U.S. 171, 181-84 (1987)); see also Crawford v. Washington, 541 U.S. 36, 56 (2004) (stating that "statements in furtherance of a conspiracy" are "by their nature" not testimonial). Ciresi attempts to dismiss these statements as mere dicta, but the Court's instruction cannot be cast aside so easily. See United States v. Jiminéz-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) (en banc); McCoy v. MIT, 950 F.2d 13,

-20-

19 (1st Cir. 1991) (concluding that "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement").

Moreover, we have already addressed this issue post-Crawford and concluded that coconspirator statements such as Zambarano's are, by their nature, not testimonial.  See Rivera-Donate, 682 F.3d at 132 n.11; United States v. De La Paz-Rentas, 613 F.3d 18, 28 (1st Cir. 2010); United States v. Malpica-Garcia, 489 F.3d 393, 397 (1st Cir. 2007) (holding that coconspirator statements were nontestimonial because they were "made in the course of private conversations or in casual remarks that no one expected would be preserved or used later at trial").[6]  Even if the Court's statements do not explicitly bind us, our prior precedents do.

Recognizing this obstacle, Ciresi contends that Davis and Michigan v. Bryant, 131 S. Ct. 1143 (2011), have clarified that "[i]n determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances," including

_____

[6] Our sister circuits are in accord.  See, e.g., United States v. Farhane, 634 F.3d 127, 162-63 (2d Cir. 2011); United States v. Underwood, 446 F.3d 1340, 1347-48 (11th Cir. 2006); United States v. Jenkins, 419 F.3d 614, 618 (7th Cir. 2005); United States v. Delgado, 401 F.3d 290, 299 (5th Cir. 2005); United States v. Hendricks, 395 F.3d 173, 183-84 (3d Cir. 2005).

-21-

the "statements and actions of both the declarant and interrogators . . . ." Id. at 1160-62; see also Davis, 547 U.S. at 828 (stating that circumstances surrounding encounter with law enforcement personnel did not "objectively indicate" that declarant's statement was testimonial). This language, Ciresi argues, constitutes an "express rejection" of Crawford's focus on the intentions of the declarant and demands that we revisit our previous holding. Ciresi ignores, however, that the Supreme Court recently placed coconspirator remarks in a category of statements that, "by their nature, [are] made for a purpose other than use in a prosecution," suggesting their nontestimonial nature. Bryant, 131 S. Ct. at 1157 n.9. Accordingly, we perceive nothing in Crawford's recent progeny that mandates a reevaluation of our prior opinions.

In short, Supreme Court precedents and our prior opinions foreclose Ciresi's arguments. Thus we find no constitutional error in the admission of Zambarano's statements.

## C. The Sentencing Challenge

During sentencing, Ciresi argued that he should be held accountable only for the $25,000 supermarket bribe, and not for the $75,000 mill bribe. Overruling his objections, the district court added to Ciresi's base offense level a two-level increase for being "involved in more than one bribe," USSG § 2C1.1(b)(1), and an eight-level increase because the bribes had totaled more than $70,000 but less than $120,000, see id. §§ 2B1.1(b)(1)(E),

-22-

2C1.1(b)(2).  These increases brought Ciresi's total offense level to 26 and, paired with a criminal history category of I, produced a Guidelines sentencing range of 63 - 78 months imprisonment.  The district court imposed an incarcerative term at the bottom of the range: 63 months.  If Ciresi's objections had been sustained, and the mill bribe had not been counted against him, his Guidelines sentencing range would have been 33 - 41 months imprisonment.

We review the district court's Guidelines calculation de novo and any predicate factual findings for clear error.  United States v. Thomas, 635 F.3d 13, 16 (1st Cir. 2011).  On appeal, Ciresi challenges the district court's factual finding that he should be held responsible for the mill bribe as well as the supermarket bribe.

We discern no error.  As we have already established, Ciresi was actively involved in both phases of the charged conspiracy.  He was instrumental in bringing about the mill bribe, dissuading Zambarano from approaching Coccoli for a bribe, advising him instead to approach O'Sullivan, and proposing Imondi as a middleman.  Therefore, the increases to his base offense level were warranted.

The only remaining issue is a minor one.  The supermarket bribe and the mill bribe add up to $100,000, and the district court apparently relied upon that sum in sentencing Ciresi.  However, the written judgment of conviction incorrectly reflects a total bribe

amount of $107,000. This figure includes two bribes in which, as the government concedes, Ciresi was uninvolved. This mistake appears to have been inadvertent, and it did not affect Ciresi's sentence. Nevertheless, it must be corrected.

## III.

We affirm with an instruction to the district court to correct Ciresi's written judgment of conviction to reflect a total bribe amount of $100,000, not $107,000.

So ordered.